## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **SHERYL LEGGS HAMILTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-10-S-3621-NW** |
| | ) | |
| **COFFEE HEALTH GROUP,** *now* | ) | |
| *known as* **REGIONAL CARE** | ) | |
| **HOSPITAL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDERS

Plaintiff, Sheryl Leggs Hamilton, initiated this action as a *pro se* litigant on December 29, 2010.[1]  The defendants included plaintiff's former employer — an entity identified in the pleadings as "Coffee Health Group, now known as Regional Care Hospital" — and four former co-workers:  Team Leader *Melinda England*; Manager of Patient Accounts *David Davis*; Central Business Office Director *Diane Myrick*; and Human Resources Director *Cheryl Lee.*[2]  The complaint accused those defendants of discriminating against plaintiff on the basis of her race and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §

---

[1] *See* doc. no. 1 (Complaint).

[2] *Id.* at 1.

621 *et seq.* ("ADEA").[3]

Prior to commencing this action, plaintiff lodged a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), asserting that she had been reprimanded, disciplined, and then fired on the basis of her race and age.[4] The EEOC investigated plaintiff's charge, closed her file, and issued a notice of right to sue.[5]   Plaintiff then timely filed a complaint based upon the allegations in her EEOC charge.[6]   Plaintiff's complaint included the additional accusation that defendant had removed her from the position of "hospital cashier," and replaced her with a white clerk.[7]

Defendants moved to dismiss the claims against the four individuals, and the claim based on plaintiff's removal from the cashier position.[8]   At that point, plaintiff retained an attorney, who filed a response conceding that the challenged claims were due to be dismissed.[9]   Accordingly, this court dismissed the claims against the four

---

[3] *Id.* at 2.

[4] *Id.* at 9.   The EEOC charge appears as page 9 of plaintiff's complaint, rather than as a separate exhibit.

[5] *Id.* at 8.   The right to sue letter appears as page 8 of plaintiff's complaint.

[6] *Id.* at 4.

[7] *Id.*

[8] *See* doc. no. 6 (Motion to Dismiss).

[9] *See* doc. no. 11 (Notice of Appearance by Michael L. Weathers); doc. no. 14 (Response to Motion to Dismiss).

individuals, and the claim based on plaintiff's removal from the cashier position.[10] The parties then stipulated to the dismissal of plaintiff's claim for violation of the ADEA,[11] and the court accordingly dismissed that claim as well.[12]

Thus, only two claims remain pending: the Title VII retaliation claim addressed in Part IV of this opinion, *infra*; and the Title VII racial discrimination claim discussed in Part V, *infra*. The following opinion addresses, first, defendant's motion to strike portions of the declaration submitted by plaintiff in opposition to defendant's motion for summary judgment, and then defendant's dispositive motion.[13]

## I. MOTION TO STRIKE

Coffee Health Group, now known as Regional Care Hospital ("defendant"), moves to strike a variety of words, sentences, and paragraphs from plaintiff's declaration in opposition to summary judgment.[14] The first forty-six paragraphs of the declaration contain plaintiff's factual allegations, and the last three paragraphs — *which together span fourteen pages* — state her rejections of the four declarations

---

[10] *See* doc. no. 22 (Memorandum Opinion and Order).

[11] *See* doc. no. 23 (Stipulation of Dismissal).

[12] *See* doc. no. 27 (Order Dismissing Fewer than all Claims).

[13] *See* doc. no. 24 (Motion for Summary Judgment); doc. no. 54 (Motion to Strike).

[14] See doc. no. 54 (Motion to Strike); *see also* doc. no. 48-1 (Declaration of Sheryl Leggs Hamilton).

3

submitted by defendant in support of its motion for summary judgment.[15]  Defendant argues that portions of plaintiff's declaration contain conclusory allegations, are not based upon plaintiff's personal knowledge, or constitute a "sham" because they contradict, without explanation, plaintiff's prior deposition testimony.[16]

In response, plaintiff argues that the court should treat her declaration leniently, because she is a layperson — an allegation that is made without apparent embarrassment, despite the fact that plaintiff has been represented by counsel since June 13, 2011.[17]  In addition, plaintiff submitted a *twenty-two-page* *supplemental declaration* in an attempt to explain the contradictions between her deposition testimony and her *original declaration*.[18]

## A.   Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56(c)(4) states that:  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or

---

[15] *See* doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton); *see also* doc. no. 26-14 (Declaration of David Davis); doc. no. 26-15 (Declaration of Diane Myrick); doc. no. 26-16 (Declaration of Cheryl Lee); doc. no. 26-17 (Declaration of Melinda England).  The multiple subparagraphs of the final paragraphs of plaintiff's declaration are not numbered sequentially.  *See* doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton).  Accordingly, when this court cites to information contained in those subparagraphs, it will cite to page numbers, not paragraph numbers.

[16] Doc. no. 54 (Motion to Strike), at 1-2.

[17] *See* doc. no. 11 (Notice of Appearance by Michael L. Weathers).

[18] *See* doc. no. 55-1 (Supplemental Declaration of Sheryl Leggs Hamilton).

4

declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

Thus, "conclusory allegations without specific supporting facts have no probative

value."  *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

Eleventh Circuit precedent permits district courts to "disregard an affidavit as

a sham when a party to the suit files an affidavit that contradicts, without explanation,

prior deposition testimony on a material fact."  *Kernel Records Oy v. Mosley*, 694

F.3d 1294, 1300 n.6 (11th Cir. 2012) (citing *Van T. Junkins & Associates, Inc. v. U.S.

Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).  In order for that rule to apply,

however, "'[t]he earlier deposition testimony [must] consist of clear answers to

unambiguous questions which negate the existence of any genuine issue of material

fact."  *Kernel*, 694 F.3d at 1300 n.6 (alterations supplied) (citing *Lane v. Celotex

Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986)).  The so-called "sham affidavit rule"

applies with equal force to declarations.  *See, e.g.*, *Baloco v. Drummond Co.*, No.

7:09-CV-00557-RDP, 2012 WL 4009432, *36 (N.D. Ala. Sept. 12, 2012) (citing *Van

T. Junkins*, 736 F.2d at 657).

In light of Federal Rule of Civil Procedure 56(c)(4), and this Circuit's

prohibition on "sham" affidavits, the court will strike the following parts of plaintiff's

testimony.

**1**.    **Allegations That Melinda England Made Racist Statements to**

**Plaintiff**

Plaintiff asserts in her declaration filed in opposition to summary judgment that Team Leader Melinda England said that "African-Americans were lazy and would not pull their load," "African-Americans were not responsible people," and that plaintiff, "as an African-American, was lazy and would not work."[19]   During her earlier deposition, however, plaintiff testified as follows:

> Q.     . . . Did Melinda England ever make any race-based comments to you?
>
> A.     She as soon to have, she gave me that look.
>
> Q.     So you're basing her racism on a look?
>
> A.     She had that look.
>
> Q.     Okay.  And you believe it was a racist look?
>
> A.     That's correct.
>
> Q.     *Okay.  But she never made any comments to you?*
>
> A.     *She didn't make a comment to me.*[20]

"Recognizing that parties may try to escape summary judgment by using affidavits to create issues of fact where none existed, [the Eleventh Circuit has]

---

[19] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 3; *see also* doc. no. 26-17 (Declaration of Melinda England) ¶ 4.

[20] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 413-14 (emphasis supplied).

allowed an affidavit to be disregarded as a 'sham' if it flatly contradicts earlier deposition testimony in a manner that cannot be explained." *Akins v. Fulton County*, 278 F. App'x 964, 968 (11th Cir. 2008) (alteration supplied).

Given the contradiction between the assertions in plaintiff's *declaration* that England made specific racist statements to her, and plaintiff's prior *deposition testimony* that clearly, and without qualification, stated that England did *not* make any racist comments to her, this court will strike plaintiff's contradictory declaration statements.

### 2. Allegations That Melinda England Made Racist Statements About Plaintiff to David Davis

Plaintiff also alleged in her declaration that Team Leader *Melinda England* told Manager of Patient Accounts *David Davis* that "African-Americans were lazy and would not pull their load," "African-Americans were not responsible people," and that plaintiff, "as an African-American, was lazy and would not work."[21]

As previously noted, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4) (alteration supplied).

---

[21] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 3; *see also* doc. no. 26-14 (Declaration of David Davis) ¶ 1.

Plaintiff has produced no evidence that she has personal knowledge of a conversation between Melinda England and David Davis in which such statements allegedly were made. Accordingly, this court will strike that portion of plaintiff's declaration. *See, e.g.,* Fed. R. Evid. 802.

## B. Federal Rule of Evidence 701

Plaintiff also argues that some of the testimony contested by defendant is admissible as "lay opinion evidence" pursuant to Federal Rule of Evidence 701(a), because she has personal knowledge of the matters to which she attests, and defendant's "full and fair opportunity to cross-examine" plaintiff at trial will cure any defects in the assertions contained in her declaration.[22]

Federal Rule of Evidence 701 allows a lay witness to testify in the form of an opinion, *provided* such testimony "is limited to" those opinions or inferences that are: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.[23] Plaintiff's attorney focuses upon subpart (a) of that Rule, but the

---

[22] Doc. no. 55 (Response to Motion to Strike), at 2-8.

[23] Rule 702 pertains to the testimony of a witness who is qualified as a so-called "expert" because of his or her knowledge, skill, experience, training, or education, and who is thereby permitted to express an opinion, *provided*: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

most important part in the context of the present issue is the "helpfulness" requirement embodied in Rule 701(b).  That subpart is designed to "provide assurances against the admission of opinions which would *merely tell the jury what result to reach*."  *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (quoting Fed. R. Evid. 701 Advisory Committee Note on 1972 Proposed Rule) (emphasis supplied); *see also Lightfoot v. Union Carbide Corp*., 110 F.3d 898, 912 (2d Cir. 1997) (same).  Thus, if "'attempts are made to introduce meaningless assertions [that] amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by [Rule 701(b)].'"  *Rea*, 958 F.2d at 1215 (quoting Advisory Committee Note) (alterations supplied).

In addition, the Eleventh Circuit has cautioned that, in the context of employment discrimination suits, "a discharged employee's mere suspicion of . . . discrimination, unsupported by personal knowledge of discrimination, will not constitute [proof of] pretext."  *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1026 (11th Cir. 1994) (alteration supplied) (citing *Slaughter v. Allstate Insurance Co.*, 803 F.2d 857, 860 (5th Cir. 1986)).  Therefore, "testimony based on conjecture alone is insufficient to raise an issue as to the existence of [an] alleged [discriminatory] policy."  *Sturniolo*, 15 F.3d at 1026 (alterations supplied) (quoting *Slaughter*, 803

principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

F.2d at 860).  In summary, such testimony does *not* constitute admissible "lay opinion evidence" under Federal Rule of Evidence 701.  The Second Circuit explained this rule in the following manner in *Hester v. BIC Corp.*, 225 F.3d 178 (2d Cir. 2000):

> [I]n an employment discrimination action, Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision.  Witnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or with other employees, but "the witness's opinion as to the defendant's [ultimate motivations] will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant" was motivated by an impermissible animus.  *Rea*, 958 F.2d at 1216. . . . A jury can draw its own conclusions "from observed events or communications that can be adequately described" to it. . . . But [a witness's] speculative lay opinion that [a supervisor's conduct] is attributable to race[, or some other protected characteristic of the particular plaintiff,] rather than anything else, is not helpful . . . because it "merely tells the jury what result to reach."  *Id.* at 1215.

*Hester*, 225 F.3d at 185 (alterations supplied).

The foregoing principles must be applied to plaintiff's claims ("lay opinions") that the following five coworkers were racially biased:  Team Leader *Melinda England*; Manager of Patient Accounts *David Davis*; Central Business Office Director *Diane Myrick*; Human Resources Director *Cheryl Lee*; and Human Resources employee *Kim Cole*.[24]

---

[24] *See* doc. no. 26-15 (Declaration of Diane Myrick) ¶ 1; doc. no. 26-16 (Declaration of Cheryl Lee) ¶ 2; doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 31 (noting that Kim Cole worked in the human resources department).

10

For example, plaintiff alleged:  that England, Davis, and Myrick "singled [her] out *as an African-American* and applied a much harsher and incorrect system of production [*i.e.*, means of measuring productivity] to [plaintiff]";[25] that Myrick "let [plaintiff] know how *she did not like African-Americans* by the tone of her voice and her very condescending gestures and attitude towards [plaintiff]";[26] that Myrick "tried everything she could to keep [plaintiff] from transferring to work in Florence, Alabama *because* [*plaintiff is*] *African-American*";[27] that England, Davis, and Myrick used certain documents "as a pretext for suspending [plaintiff] and firing [plaintiff] *to cover up* [*their*] . . . *racial animus against* [*plaintiff*]";[28] that England, Davis, and Myrick "singled [plaintiff] out, *as an African-American*, and wrongfully blamed [her]" for hanging up the telephone on a patient;[29] and that England, Davis, Myrick, Lee, and Cole "*made it clear to* [*plaintiff*] *how they disliked African-Americans, including* [*plaintiff*]" when they refused to complete all of the steps of defendant's appellate procedure for plaintiff's discrimination complaint.[30]

As the Eleventh Circuit has observed, "testimony based on conjecture alone is

---

[25] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 6 (alterations and emphasis supplied).

[26] *Id.* ¶ 7 (alterations and emphasis supplied).

[27] *Id.* ¶ 19 (alteration and emphasis supplied).

[28] *Id.* ¶ 29 (alterations and emphasis supplied).

[29] *Id.* ¶ 40 (alterations and emphasis supplied).

[30] *Id.* ¶ 42 (alterations and emphasis supplied).

insufficient to raise an issue as to the existence of [an] alleged [discriminatory] policy." *Sturniolo*, 15 F.3d at 1026 (alterations supplied) (quoting *Slaughter*, 803 F.2d at 860). "Witnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or with other employees, but . . . speculative lay opinion that [a supervisor's conduct] is attributable to race rather than anything else, is not helpful[.]" *Hester*, 225 F.3d at 185 (alterations supplied).

Accordingly, this court will consider plaintiff's testimony with regard to the *actions* of her coworkers, and the *tone of voice* each used when speaking to her, but will strike her conclusory opinions that the *motivation* for the alleged actions was discriminatory animus towards African-Americans.

Thus, the following statements can be considered:  that England, Davis, and Myrick "singled [plaintiff] out . . . and applied a much harsher and incorrect system of production to [plaintiff]";[31] that Myrick used a disrespectful "tone of her voice and . . . very condescending gestures and attitude towards [plaintiff]";[32] that Myrick "tried everything she could to keep [plaintiff] from transferring to work in Florence, Alabama";[33] that England, Davis, and Myrick used certain documents "as a pretext

---

[31] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 6 (alteration and emphasis supplied).

[32] *Id.* ¶ 7 (alterations and emphasis supplied).

[33] *Id.* ¶ 19 (alterations and emphasis supplied).

for suspending [plaintiff] and firing [plaintiff]";[34] that England, Davis, and Myrick "singled [plaintiff] out . . . and wrongfully blamed [her]" for hanging up the telephone on a patient;[35] and that England, Davis, Myrick, Lee, and Cole refused to complete all of the steps of defendant's appellate procedure for plaintiff's discrimination complaint.[36]

On the other hand, the following testimony cannot be taken into account when considering defendant's motion for summary judgment:  that England, Davis, and Myrick "singled [plaintiff] out *as an African-American*";[37] that Myrick "*let* [*plaintiff*] *know how she did not like African-Americans*";[38] that Myrick thwarted plaintiff's transfer "*because* [*plaintiff is*] *African-American*";[39] that England, Davis, and Myrick disciplined and terminated plaintiff "*to cover up* [*their*] . . . *racial animus against* [*plaintiff*]";[40] that England, Davis, and Myrick "singled [plaintiff] out, *as an African-American*";[41] and that England, Davis, Myrick, Lee, and Cole "*made it clear to*

---

[34] *Id.* ¶ 29 (alterations and emphasis supplied).

[35] *Id.* ¶ 40 (alterations and emphasis supplied).

[36] *Id.* ¶ 42 (alterations and emphasis supplied).

[37] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 6 (alterations and emphasis supplied).

[38] *Id.* ¶ 7 (alterations and emphasis supplied).

[39] *Id.* ¶ 19 (alteration and emphasis supplied).

[40] *Id.* ¶ 29 (alterations and emphasis supplied).

[41] *Id.* ¶ 40 (alterations and emphasis supplied).

13

[*plaintiff*] how they disliked African-Americans, including [*plaintiff*]."[42]

## C.   Other Declaration Statements Contested by Defendant

In addition to raising the worthy issues discussed in Parts I(A) and I(B) above, defendant's motion to strike repeatedly quibbles with plaintiff's choice of words on matters that have no apparent impact upon summary judgment issues.[43] *See generally Nicolatos v. Sprint/United Management Co.*, No. 1:05-CV-1722-RLV, 2006 WL 3490817, *9 (N.D. Ga. Nov. 28, 2006) (citing *Lane v. Celotex Corp.*, 782 F.2d 1526, 1530 (11th Cir. 1986)) ("The inconsistencies between the deposition and the affidavit must be *substantial* because not every discrepancy will justify a court's refusal to consider the contradictory evidence.") (emphasis supplied); *Travelers Indemnity Co. v. General Star Indemnity Co.*, 157 F. Supp. 2d 1273, 1279 (S.D. Ala. 2001) (denying a motion to strike because "the 'inconsistency' has no impact on the outcome of this action").

In the interest of conservation of resources, this court will not analyze

---

[42] *Id.* ¶ 42 (alterations and emphasis supplied).

[43] *See* doc. no. 54 (Motion to Strike).  For example, defendant challenges plaintiff's contention that Manager of Patient Accounts *David Davis* "forcefully" stopped plaintiff from manually tracking her performance numbers on the grounds that her use of the word "forcefully" is conclusory. *Id.* at 7.  Defendant also challenges plaintiff's description of her 2003-2006 performance evaluations as "extremely high," preferring to define them as merely "good." *Id.* at 6; doc. no. 25 (Brief in Support of Motion for Summary Judgment), at 2.  Because the numerical scores that plaintiff received on her performance evaluations were submitted into evidence, the descriptions of those evaluations will not impact the decision on summary judgment.

defendant's numerous other requests in detail.  Upon consideration, the remainder of the motion to strike will be denied.  *See generally Grant v. Murphy & Miller, Inc.*, 149 F. Supp. 2d 957, 974-75 (N.D. Ill. 2001) ("[T]his Court will not perform an exhaustive line-by-line analysis of th[e] motion [to strike] because it has taken care to ensure that its opinion is based only on admissible evidence.  Moreover, any such effort could convert this already overly lengthy effort into near-novella length.") (alterations supplied); *United States v. Nutri-Cology, Inc.*, No. C-91-1332-DLJ, 1993 WL 13585505, *16 (N.D. Cal. Sept. 23, 1993) ("The Court will only consider the relevant, admissible evidence presented in the parties' summary judgment motions and will not, at this time, either strike the declarations in whole or review the evidence, line by line, for admissibility."); *Dell'Aquila v. River Bank America*, No. 92-3271 (HLS), 1993 WL 1618646, *4-5 (D. N.J. Apr. 16, 1993) ("The court declines to make a paragraph by paragraph decision as to which sentences or words will be struck from the record.").

## II.  SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he

plain language of Rule 56(c) mandates the entry of summary judgment, after adequate

time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986) (alteration supplied).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> [However,] [t]he mere existence of *some* factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal

citations omitted) (alterations and emphasis suppled).

### III.  SUMMARY OF FACTS

Plaintiff is an African-American who was hired to work as a

registration/admissions clerk (sometimes referred to as a "cashier") at Russellville

Hospital in Russellville, Alabama in 1999.[44]   The following year, defendant

purchased the hospital, and created a central business office in the nearby city of

---

[44] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 66-67.

16

Florence, Alabama.[45]

## A.    Plaintiff's Assignment to the Position of Customer Service Representative

After defendant purchased the hospital, plaintiff continued to reside in Russellville and, understandably, desired to remain at Russellville Hospital.[46]  Even so, defendant selected a white employee to fill the Russellville position, and assigned plaintiff to work in its Florence business office as a customer service representative.[47]

Like the duties of a "cashier," the duties of a customer service representative included answering questions from walk-in patients.[48]  However, a customer service representative was also responsible for assisting with billing, insurance, and collections.[49]  Indeed, one of the "essential job functions" of the position was attempting to collect on patients' past-due debt.[50]

According to plaintiff, Central Business Office Director *Diane Myrick* made the challenged personnel decision because she "needed a white face . . . at Russellville Hospital."[51]  Myrick testified, however, that she collaborated on the

---

[45] *Id.* at 67-68; doc. no. 26-10 (Deposition of Diane Myrick), at 18-22; doc. no. 26-14 (Declaration of David Davis) ¶ 3.

[46] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 389-94; *see also* doc. no. 1 (Complaint) ¶ 1 (stating that plaintiff was a resident of Russellville).

[47] *Id.*

[48] *See* doc. no. 26-5 (Performance Evaluation), at 13.

[49] *See id.* at 3 (listing the "essential job functions" of a customer service representative).

[50] *See id.*

[51] *Id.*

selection decision with the Human Resources Director of defendant's three hospitals, and that the white employee selected to fill the position formerly occupied by plaintiff had nine more years of experience than plaintiff.[52]

**B.    Plaintiff's Allegations That David Davis Treated Her Differently on the Basis of Her Race**

Plaintiff began reporting to Manager of Patient Accounts *David Davis* in 2001. Davis, in turn, reported to Central Business Office Director *Diane Myrick*.[53]  Plaintiff asserts in her declaration that Davis "looked at [her] and talked to [her] in a very harsh, derogatory and demeaning way and tone of voice."[54]  Plaintiff also alleges that "Davis always took pride in saying to [plaintiff] and others, '[plaintiff] is dragging at the bottom, as an African-American.'  (Doc. 26-2 [*i.e.*, Excerpts from the Deposition of Plaintiff], at 239-240)."[55]  Notably, however, the deposition pages cited by plaintiff as authority for the assertion made in the preceding sentence from her attorney's brief in opposition to summary judgment do not support the allegation. Plaintiff actually testified as follows:

---

[52] Doc. no. 26-10 (Deposition of Diane Myrick), at 18-22.

[53] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 68-69; doc. no. 26-14 (Declaration of David Davis) ¶¶ 1-2; doc. no. 26-15 (Declaration of Diane Myrick) ¶¶ 1-2.

[54] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 7 (alterations supplied); *see also id.* at ¶ 25.

[55] Doc. no. 47 (Brief in Response to Motion for Summary Judgment), at 35-36 (citing doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 239-40).

A.      . . . . [Davis] always took pride in saying, "[plaintiff] is dragging at the bottom, as an African American."

Q.      Did he ever make a comment where he said, "[Plaintiff], *as an African American*"?  *Did . . . Davis ever say that?*

A.      He might as well.

Q.      That's not my question, ma'am.

A.      He might as well.  When he looked at me —

Q.      Ma'am, please answer my question.  Did he ever say —

A.      When he yelled at me, he might as well.[56]

In sum, Davis did not utter the words "as an African American."  Plaintiff simply drew a conclusory opinion based upon his tone of voice and the manner in which he "looked" at her.  Such qualities are ambiguous, however.  It is entirely possible, for example, that Davis talked to and looked at plaintiff in a disrespectful manner for reasons that were wholly unrelated to her race:  *e.g.*, the manner in which she performed (or failed to perform) the duties of her job.

## C.      Melinda England's Display of a Confederate Flag Tag on Her Automobile

At some unspecified date in 2007, Team Leader *Melinda England* gave her sixteen-year-old son permission to decorate the front bumper of her automobile with

---

[56] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 239-40 (alterations and emphasis supplied).

19

a tag depicting the confederate flag.[57]    Despite plaintiff's complaints to Central Business Office Director *Diane Myrick* and Manager of Patient Accounts *David Davis*, defendant took no action against England.[58]

**D.    Plaintiff's 2007 Annual Performance Evaluation**

As part of her duties as a customer service representative, plaintiff was required to call patients in an effort to collect debt.[59]    At first, plaintiff consistently received annual performance evaluation scores of 3.3 (or greater) out of 4:  *e.g.*, a rating of 3.32 on December 12, 2003;[60] a rating of 3.32 on November 29, 2004;[61] a rating of 3.37 on November 7, 2005;[62] and a rating of 3.40 on April 10, 2006.[63]

According to plaintiff's August 1, 2007 annual performance evaluation, however, her debt collections were the lowest of defendant's four "main" customer service representatives:  a fact that caused her performance rating to drop to 3.05 —

---

[57] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 413-14; doc. no. 26-12 (Deposition of Melinda England), at 34-40; doc. no. 26-17 (Declaration of Melinda England) ¶ 3.

[58] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 9.

[59] *See, e.g.*, doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 117-18; doc. no. 26-4 (Performance Evaluation), at 64.

[60] Doc. no. 26-7 (Deposition of David Davis, Part I), at 134-35, 143-44; doc. no. 39-1 (Performance Evaluation), at 1-16.

[61] Doc. no. 26-7 (Deposition of David Davis, Part I), at 135, 144; doc. no. 39-1 (Performance Evaluation), at 17-36.

[62] Doc. no. 26-7 (Deposition of David Davis, Part I), at 136, 144; doc. no. 39-1 (Performance Evaluation), at 37-50.

[63] Doc. no. 26-7 (Deposition of David Davis, Part I), at 136-37, 144; doc. no. 39-1 (Performance Evaluation), at 51-63.

20

the numerical equivalent of "Meets Expectations."[64]  In an August 1, 2007 e-mail to

Manager of Patient Accounts *David Davis*, plaintiff offered the following theories in

an effort to explain the deterioration in her performance:

> I received my Performance Evaluation today and there must be some technical problem that we are not aware of.  I am making contacts with my patients and requesting money.  However, when it is time to pay the customer does not always follow thru.
>
> I am being compared to my other co-workers, but many of them are putting in multiple reminders.  The multiple reminders allow it to look like you have made customer contacts in abundance.  I am talking to walking in customers, e-mail customer[s], those customers who call in and those customers that I call to offer them to pay.
>
> I conclude that there maybe a problem in how I am entering my notes on each patient's account.  This is being looked at to resolve the issue.[65]

As a result of the decrease in plaintiff's annual performance evaluation score,

she was placed on a ninety-day performance improvement plan.[66]  At the conclusion

of the plan, Manager of Patient Accounts David Davis *informally acknowledged* that

plaintiff had increased her collections, but did not *formally meet* with her to discuss

---

[64] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 114-18; doc. no. 26-4 (Performance Evaluation), at 64-77; doc. no. 26-7 (Deposition of David Davis, Part I), at 137-38, 144.

[65] Doc. no. 39-1 (Hamilton E-Mail), at 75 (alteration supplied).

[66] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 117-18; doc. no. 26-4 (Performance Evaluation), at 64.

her progress.[67]   Although Davis alleged that there was no need to hold a formal meeting because the productivity reports compiled during the ninety-day performance improvement period reflected plaintiff's improvement,[68] plaintiff argued that Davis "ignored" her requests for a meeting and, thus, prevented her from receiving "credit" for her increased collections.[69]

In response to defendant's motion for summary judgment, plaintiff alleged in her declaration that, "[o]n Dec. 19, 2007, [plaintiff] took a letter to [Kim] Cole, Director of [Human Resources] at [Eliza Coffee Memorial Hospital] East, reported Davis's refusal to re-evaluate her, *and complained that Davis was racially discriminating against her*."[70]   An actual review of plaintiff's letter to Cole reveals, however, that it stated only that plaintiff "requested twice for a reevaluation," but that her improvement "was not recognized enough for a conference."[71]   *The letter contained no allegations of racial discrimination against Davis or any other*

---

[67] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 120; doc. no. 26-4 (E-Mail Chain), at 104; doc. no. 26-8 (Deposition of David Davis, Part II), at 373-74, 384-85; doc. no. 26-14 (Declaration of David Davis) ¶ 4.

[68] Doc. no. 26-8 (Deposition of David Davis, Part II), at 384-85; doc. no. 26-14 (Declaration of David Davis) ¶ 4.

[69] Doc. no. 47 (Brief in Response to Motion for Summary Judgment), at 8 (alteration supplied).

[70] *Id.* (citing doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 31, doc. no. 36-2 (Hamilton E-Mail), at 2) (emphasis supplied).

[71] Doc. no. 36-2 (Hamilton E-Mail), at 2

*employees.*[72]

### E.    Plaintiff's Reprimand for Insubordination

In an e-mail dated November 7, 2007, Central Business Officer Director *Diane Myrick* invited central business office employees to apply for permission to work longer hours on the Monday, Tuesday, and Wednesday preceding the 2007 Thanksgiving holiday (*i.e.*, November 19-21), for the purpose of allowing the employees to spend more time with their families over the holiday weekend.[73] Plaintiff responded to Myrick's e-mail, adding a copy to Manager of Patient Accounts *David Davis*, with a request to work *twelve-hour days* on Monday through Wednesday, November 19-21.[74]

Myrick and Davis separately responded to plaintiff's e-mail.  Davis initially approved the twelve-hour schedule at 12:14 p.m.[75]  One minute later, however, Myrick wrote:  "Usually we allow 10 hour workdays but not 12.  I am not sure that is productive.  What do you plan to work on during that time?  You cannot call patients past 8:00 p.m.  Do you really think you will be productive all those hours?"[76]

---

[72] *See id.*

[73] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 132-33; doc. no. 26-4 (E-Mail Chain), at 84.

[74] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 132-33; doc. no. 26-4 (E-Mail Chain), at 85.

[75] Doc. no. 26-4 (E-Mail Chain), at 84.

[76] *Id.* at 82.

Within two minutes, Davis backed out his initial approval of plaintiff's request and endorsed Myrick's opinion, saying: "I did not at first notice that you were asking for 12-hour days. That is not approved. You can work three 10[-hour days] and then use PTO [*i.e.*, paid time off] for the rest."[77]

In an effort to address Myrick's concerns, plaintiff e-mailed her five minutes later, at 12:20 p.m., explaining that she had "a Cash Retriver [sic] follow-up file to work on," plus "accounts ready to be collected on that require some follow-up as well, but will not necessary [sic] require a call."[78] Five minutes after that, plaintiff again e-mailed Myrick to complain that "Dave approved at first. However, after your reply, he refused."[79] Plaintiff also requested that Myrick "send me an o.k. or a denial o.k. attached to my last e-mail explaining how I will be productive on my work."[80] Myrick responded that she "would prefer" for plaintiff to only work ten-hour days.[81]

Davis and Myrick testified that they met with plaintiff on November 9, 2007, for the purpose of explaining their decision.[82] At her deposition, plaintiff testified

---

[77] *Id.* at 84 (alterations supplied).

[78] *Id.* at 82.

[79] *Id.* at 84.

[80] *Id.*

[81] Doc. no. 39-1 (E-Mail Chain), at 82.

[82] Doc. no. 26-8 (Deposition of David Davis, Part II), at 221-22; doc. no. 26-14 (Declaration of David Davis) ¶ 5; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 3; doc. no. 39-1 (E-Mail Chain), at 82.

that she did not "remember" the meeting, but she *refused to testify* that, if Davis and Myrick stated that such a meeting had occurred on November 9th, then they were not telling the truth.[83]  In her declaration, however, plaintiff *explicitly denied that such a meeting took place.*[84]

In any event, on November 20, 2007, plaintiff worked 11.5 hours.[85]  One week later, she was reprimanded for insubordination.[86]  Defendant did not permit any other central business office employees to work twelve-hour days during the week of the 2007 Thanksgiving holiday.[87]  Davis and Myrick were not aware of any other employees who ignored a management instruction with regard to their work schedules.[88]  On the other hand, plaintiff alleged that Customer Service Representative *Carlette Robinson* violated Davis's instructions by reporting to work

---

[83] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 140-41.

[84] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton), at 18.  As noted in footnote 15, *supra*, the multiple subparagraphs of the final paragraphs of plaintiff's declaration are not numbered sequentially.  *See id.*  Accordingly, when this court cites to information contained in those subparagraphs, it will cite to page numbers, not paragraph numbers.

[85] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 141-46; doc. no. 26-4 (Employee Reprimand), at 78.

[86] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 124-25; doc. no. 26-4 (Employee Reprimand), at 78.

[87] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 135-36; doc. no. 26-8 (Deposition of David Davis, Part II), at 248-49; doc. no. 26-14 (Declaration of David Davis) ¶ 5; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 4.

[88] Doc. no. 26-14 (Declaration of David Davis) ¶ 5; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 4.

in January of 2010 on a date that the office was closed, but was not reprimanded.[89] That fact does not advance plaintiff's interests in this case, however, because Robinson also is African-American.

## F.   Plaintiff's Reprimand for Improper Collection Practices

Plaintiff was reprimanded for improper collection practices on December 19, 2007.[90]  In a detailed written description of the reprimand, defendant reaffirmed that all of the employees in the customer service department had "been instructed not to claim collections for their productivity report until the dollars collected have been posted."[91]

When defendant performed an audit of plaintiff's accounts as part of a regular productivity review, it discovered that plaintiff had claimed six accounts as "collected" before payments were posted.[92]  For two of those accounts, it was "possible that the credit card posting was late."[93]  Even so, the other two accounts were never paid.[94]  Plaintiff also claimed that a seventh account had been "collected"

---

[89] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 444-45; doc. no. 26-5 (Myrick E-Mail), at 56.

[90] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 149-58; doc. no. 26-4 (Employee Reprimand), at 87-88.

[91] Doc. no. 26-4 (Employee Reprimand), at 87-88.

[92] *Id.*

[93] *Id.*

[94] *Id.*

for an amount that was twice the actual amount owed.[95]

During their respective depositions, plaintiff and Manager of Patient Accounts *David Davis* each testified that they were not aware of *any* other employees who had claimed accounts as "collected" before the payments were posted.[96]   In her declaration, however, plaintiff alleged just the opposite, and asserted that *all* customer service representatives did so, because credit card payments sometimes posted late.[97] She also alleged that white customer service representatives who did so were not reprimanded.[98]

## G.    Plaintiff's 2008 Annual Performance Evaluation

Manager of Patient Accounts *David Davis* gave plaintiff a performance rating of 3.15 out of 4 on December 18, 2008 — the numerical equivalent of her 2007 rating, "Meets Expectations."[99]

## H.    Plaintiff's Application for the Position of Non-Medicare Revenue Integrity Specialist

After Jennifer Pate resigned the position of "non-Medicare revenue integrity

---

[95] *Id.*

[96] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 158-59; doc. no. 26-8 (Deposition of David Davis, Part II), at 255-56.

[97] Doc. no. 48-1 (Declaration of Sheryl Leggs Hamilton) ¶ 22.

[98] *Id.*

[99] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 164-67, 181; doc. no. 26-4 (Performance Evaluation), at 91.

specialist," defendant posted an opening for the position.[100]  Defendant's Employee Handbook required job postings to "remain on the board for at least five days, including weekend days":[101]  in other words, five calendar days.  Because the "non-Medicare revenue integrity specialist" position was posted on July 30, 2009, the position had to remain open until August 4, 2009.[102]

Defendant received applications from two African-American employees in response to its job posting (plaintiff and Tammy Simmons) and three white employees (Belinda Gotcher, Melissa Baskins, and Belynn "Ann" Heathcoat).[103] Only one of those five employees submitted her application by August 4th:  *i.e.*, Tammy Simmons, who applied on August 3rd.[104]  Belinda Gotcher and Melissa Baskins submitted their applications on August 5th:  one day late.[105]  Plaintiff and Ann Heathcoat submitted their applications on August 6th:   two days late.[106] (Plaintiff was not present to confirm when the human resources department actually

---

[100] Doc. no. 26-10 (Deposition of Diane Myrick), at 158; doc. no. 26-16 (Notice of Position Open), at 8.

[101] Doc. no. 26-3 (Employee Handbook), at 80.

[102] Doc. no. 26-10 (Deposition of Diane Myrick), at 158; doc. no. 26-16 (Notice of Position Open), at 8.

[103] Doc. no. 26-10 (Deposition of Diane Myrick), at 160; doc. no. 26-16 (Notice of Position Open), at 9; doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 23.

[104] Doc. no. 26-16 (Notes Regarding Dates of Applications), at 9.

[105] *Id.*

[106] *Id.*

received her application.[107])

The parties have not provided the specific date on which this selection decision was made, but a "decision to fill a position [generally was] subject to being made at the end of the 5th day of posting."[108]  In any event, Central Business Office Director *Diane Myrick* and Manager of Patient Accounts *David Davis* awarded the position to Melissa Baskins, the white female who submitted her application one day late.[109] Human Resources employee Jeannie Kilpatrick sent identical e-mails to plaintiff and Heathcoat on August 11, 2009, stating that their applications were received after the position had been filled.[110]  Davis and Myrick testified that they were not aware of plaintiff and Heathcoat's applications at the time when they awarded the position to Baskins.[111]

## I.   Plaintiff's Reprimand for Violating Patient Confidentiality

Plaintiff was trained on patient confidentiality and given an employee

---

[107] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 204.

[108] Doc. no. 26-4 (E-Mail Chain), at 104 (alteration supplied).

[109] *Id.* at 212-17; doc. no. 26-14 (Declaration of David Davis) ¶ 8; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 5.

[110] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 195-201; doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 202-08; doc. no. 26-4 (E-Mail Chain), at 104; doc. no. 26-16 (Declaration of Cheryl Lee) ¶ 3.

[111] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 212-17; doc. no. 26-14 (Declaration of David Davis) ¶ 8; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 5.

handbook containing policies that prohibited disclosure of patient information.[112] One event described in the evidence concerns a patient who returned an itemized bill to defendant because the bill that had been mailed to her pertained to another patient. Manager of Patient Accounts *David Davis* observed that plaintiff's handwriting appeared on the envelope in which the bill had been mailed.[113] Davis also testified that, "[w]hen he spoke to [plaintiff] about it, [she] told [him] that that was her handwriting on the envelope."[114] Plaintiff's declaration contradicts that assertion, however, and says that her "handwriting never appeared on the envelope."[115] Further, during her deposition plaintiff blamed the incident on Customer Service Representative Shirely Cross, who also worked on the patient's account.[116] In response to defendant's motion for summary judgment, plaintiff mischaracterized David Davis's testimony and argued that Davis "admitted he never determined 'for sure' that it was [plaintiff] who sent one patient's account information to another patient."[117] In fact, however, Davis testified as follows:

---

[112] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 45, 47-57, 61-62; doc. no. 26-3 (Handbook Acknowledgment), at 68; *id.* (Employee Handbook), at 77.

[113] Doc. no. 26-4 (Employee Reprimand), at 107; doc. no. 26-8 (Deposition of David Davis, Part II), at 273-77.

[114] Doc. no. 26-8 (Deposition of David Davis, Part II), at 276-77 (alterations supplied).

[115] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 24.

[116] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 222-23, 225, 228.

[117] Doc. no. 47 (Brief in Response to Motion for Summary Judgment), at 14 (alteration supplied) (quoting doc. no. 26-8 (Deposition of David Davis, Part II), at 275).

A.     An itemized bill went out — *was sent out by* [*plaintiff*].  We got a call saying, "This is not mine," from the person that received it, and we asked them to send it back to us, which they did, and they sent it back to us also with the envelope that they were sent it in, and *it was a bill that* [*plaintiff*] *had sent out.*

Q.     All right.  And what did [plaintiff] tell you about that?

A.     What [plaintiff] said was that other people had handled the account also.   Other people had handled the account, but [*plaintiff*] *was the one that sent out the itemized bill*.  It appeared that [plaintiff] had gotten more than one request for one that day and had put the wrong request in the wrong envelope.

Q.     You say it appeared that way.  Did you ever determine whether that was the case or not?

A.     Well, she had gotten more than one request that day.  Did I determine that for sure?  No, but *it was determined that* [*plaintiff*] *was the one who sent out the itemized bill.*[118]

In sum, Davis testified clearly and repeatedly that plaintiff was the one who mailed an itemized bill to the wrong patient.  What Davis did not determine "for sure" was the chain of events that caused plaintiff to misaddress the envelope in which the bill was mailed.  Regardless of the cause of the error, plaintiff was reprimanded for violating defendant's patient confidentiality policy on October 29, 2009.[119]

Plaintiff alleged that white "casual" employee Gayle Burgess and African-

---

[118] Doc. no. 26-8 (Deposition of David Davis, Part II), at 274-75 (alterations and emphasis supplied).

[119] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 219-21; doc. no. 26-4 (Employee Reprimand), at 107; doc. no. 26-14 (Declaration of David Davis) ¶ 24.

American Customer Service Representative Carlette Robinson each sent itemized bills to the wrong patients, but were not disciplined.[120]  (The specific duties of a "casual" employee depend upon defendant's needs.  For example, when a full-time employee takes a leave of absence, defendant may appoint a "casual" employee to temporarily fill the position.[121])

**J.      Plaintiff's Allegations that David Davis Made a Racist Statement**

Manager of Patient Accounts *David Davis* allegedly yelled at plaintiff for arriving late to a company meeting on January 12, 2010.  Plaintiff testified that he said:  "You hurry up.  You need to get in here.  As African-Americans, y'all are always running late.  You just need to hurry up and get on in here because class has already started."[122]  Davis denied making the comment about "African-Americans . . . . always running late."[123]  (See also the discussion in Part III(B), *supra*.)

**K.      Plaintiff's 2009 Annual Performance Evaluation** (See also Parts III(D) and (G), *supra*, discussing plaintiff's 2007 and 2008 annual performance evaluations)

Team Leader *Melinda England* allegedly became plaintiff's immediate

---

[120] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 352-54, 357-59, 363, 407-08.

[121] Doc. no. 26-15 (Declaration of Diane Myrick) ¶ 11.

[122] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 239-41, 448-50.

[123] Doc. no. 26-7 (Deposition of David Davis, Part I), at 75-76.

supervisor in late 2009 or early 2010.[124]   Plaintiff's declaration states:  "All of my performance evaluations were extremely high until Melinda England became one of my supervisors in late 2009 and early 2010.  My performance evaluations did not drop below a rating of 3 until Melinda England became one of my supervisors."[125]

Manager of Patient Accounts *David Davis* gave plaintiff an overall performance rating of 2.97 out of 4 on March 23, 2010, including a 2.00 (the numerical equivalent of "Requires Improvement") in four categories of job functions.[126]  In the "manager narrative" section, Davis explained that the low ratings were based on a productivity comparison between plaintiff and defendant's other customer service representatives.[127]

Davis attached the productivity reports showing the number of accounts that each customer service representative worked per hour, and the amount of time that each representative spent "off line."[128]  The reports showing the number of accounts worked per hour were prepared by Recita Flie, another African-American

---

[124] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶¶ 3, 11.

[125] *Id.* ¶ 11.

[126] Doc. no. 26-5 (Performance Evaluation), at 1; doc. no. 26-8 (Deposition of David Davis, Part II), at 230-31.

[127] Doc. no. 26-5 (Performance Evaluation), at 1; doc. no. 26-8 (Deposition of David Davis, Part II), at 235-37.

[128] Doc. no. 26-5 (Performance Evaluation), at 1; doc. no. 26-8 (Deposition of David Davis, Part II), at 247-49; doc. no. 26-14 (Declaration of David Davis) ¶¶ 10, 12.

employee.[129]   Those reports included defendant's four "main" customer service representatives:  *i.e.*, plaintiff; Carlette Robinson; Rose Hale; and Shirley Cross.[130] Two of the four (plaintiff and Robinson) were African-American.[131]  The reports also included two employees who performed both customer service and cashier duties (Belinda Gotcher and Shirley Brannon), one of whom (Brannon) was African-American.[132]  The reports showing the amount of time spent "off line" were pulled from the computer system that enabled employees to work on patient accounts.[133]

According to plaintiff, the performance evaluation was a "sham," because her initials were "forged" in the "signatures" section of the contested document.[134]  Even if that be so, plaintiff admitted that she met with Manager of Patient Accounts David Davis on the date of the evaluation, and admitted to writing that she "d[id] not agree with the evaluation" in the "comments" section of the document.[135]  That statement was followed by the assertion that plaintiff sometimes had fewer callers and more

---

[129] Doc. no. 26-5 (Performance Evaluation), at 1; doc. no. 26-8 (Deposition of David Davis, Part II), at 235; doc. no. 26-14 (Declaration of David Davis) ¶ 11.

[130] Doc. no. 26-5 (Performance Evaluation), at 4.

[131] *Id.*

[132] *Id.*

[133] Doc. no. 26-14 (Declaration of David Davis) ¶ 12.

[134] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶¶ 5-6, 10-11; *see also* doc. no. 26-5 (Performance Evaluation), at 13.

[135] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 230-31; *see also* doc. no. 26-5 (Performance Evaluation), at 13 (alteration supplied).

walk-in customers, the argument that some patients required more service time than others, and the question:  "Do we really care about our customers?"[136]

Further, plaintiff believed that Davis should *not* have "compared [her,] as an African American[,] to white employees."[137]

Plaintiff also argued that the productivity reports were "incorrect," because she considered herself equally as productive as defendant's other customer service representatives based on her ability to overhear (*i.e.*, eavesdrop on) their telephone conversations with patients.[138]  Plaintiff testified that Rose Hale and Shirley Cross (the two white customer service representatives) were productive, but she was not aware of whether Carlette Robinson (the African-American representative) was productive.[139]  When asked about Robinson, plaintiff disparaged her in racial terms:

> Q.    . . . Carlette, Robinson, she was an African-American customer service rep, wasn't she?
>
> A.    That's correct, *and she was one who wanted to be white.  She was an employee* of [Manager of Patient Accounts David Davis] *who wanted to do and be white*, and if you can read even in the Birmingham papers and all papers, there is that discussion [about the difference between] *our black* versus *your black*.

---

[136] Doc. no. 26-5 (Performance Evaluation), at 13.

[137] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 235, 255 (alterations supplied).

[138] *Id.* at 259-61; doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶¶ 5-6, 10-11.

[139] *Id.* at 268, 274.

Q.      . . . What I want to know is do you know whether Ms. Robinson
        received good performance reviews?

A.      What I do know was *Ms. Robinson was/is a token employee for
        Dave Davis.*[140]

Plaintiff also attributed the difference between her productivity ratings and
those of her co-workers to the failure of pre-registration clerks to properly prepare her
accounts for processing.[141]   Nevertheless, plaintiff also acknowledged:  that pre-
registration clerks had overlapping responsibilities; that  pre-registration clerks
serviced all accounts; and that, if one pre-registration clerk was absent, another clerk
performed the absent clerk's duties, as well as her own.[142]  Likewise, Central Business
Office Director *Diane Myrick* and Manager of Patient Accounts *David Davis* testified
that the quality of the performance of pre-registration clerks (or the lack thereof)
equally impacted the accounts of *all* customer service representatives.[143]

Further, plaintiff alleged that she was placed at a competitive disadvantage
compared to her white coworkers because Myrick and Davis did not permit her to
work from home, and because her coworkers did not inform her of changes to

---

[140] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 172-75 (emphasis and
alterations supplied).

[141] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 274-75, 284-86.

[142] *Id.* at 420-24.

[143] Doc. no. 26-8 (Deposition of David Davis, Part II), at 292-94; doc. no. 26-12 (Deposition
of Melinda England), at 122-24, 137; doc. no. 26-14 (Declaration of David Davis) ¶ 13; doc. no. 26-
15 (Declaration of Diane Myrick) ¶ 6.

defendant's collection procedures.[144]  Plaintiff argued that "Melinda England, Dave Davis, and Diane Myrick singled [her] out as an African-American," and that she "complained to Melinda England, Dave Davis, and Diane Myrick that [she] was being singled out as an African-American."[145]  (Plaintiff did not explain *why* she allegedly complained to the very employees whom she accused of the discriminatory conduct.[146])

Plaintiff was placed on a ninety-day performance improvement plan, effective March 23, 2010.[147]  One month later, Manager of Patient Accounts David Davis and Team Leader Melinda England met with plaintiff to review her performance.[148]  Davis informed plaintiff that her productivity had not improved, that she had failed to service an account, and that he had witnessed her reading a novel at work.[149]  During her deposition, plaintiff denied that she was less productive than her coworkers, and

---

[144] Doc. no. 26-8 (Deposition of David Davis, Part II), at 372-373; doc. 26-9 (E-Mail Chain), at 30; doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶¶ 13, 16.

[145] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶¶ 6, 15 (alterations supplied).

[146] *See id.*

[147] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 253-54; doc. no. 26-5 (Performance Evaluation), at 13.

[148] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 263; doc. no. 26-5 (Employee Conference Form), at 15; *id.* (Charge of Discrimination), at 33; doc. no. 26-6 (Deposition of David Davis, Part I), at 41; doc. no. 26-10 (Deposition of Diane Myrick), at 40-42; doc. no. 26-13 (Declaration of Rose Hale), at 46-48.

[149] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 262-66; doc. no. 26-5 (Employee Conference Form), at 15; doc. no. 26-8 (Deposition of David Davis, Part II), at 282-93; doc. no. 26-14 (Declaration of David Davis) ¶¶ 14-15.

that she failed to service the account in question.[150]  She also claimed that Davis had not seen her reading a novel, but an employee reference manual.[151]

Plaintiff was not aware of any other employees who were disciplined for failing to service an account, but she alleged that, in 2008, Manager of Patient Accounts David Davis witnessed a white "casual" employee whose first name is "Baylee" (and whose last name plaintiff does not know) reading a magazine, and that "Baylee" was not reprimanded.[152]  Nevertheless, plaintiff acknowledged that she had not seen "Baylee's" personnel file, and was not present for the reprimands of other employees.[153]

## L.   Allegation That Plaintiff Misquoted the Amount of a Patient's Debt

Team Leader *Melinda England* discovered that someone misquoted the amount of a patient's debt in response to an inquiry on May 10, 2010.[154]  Manager of Patient Accounts *David Davis* reviewed the computer records for the patient's account and observed that "casual" employee Kayla Aldridge (who was performing the duties of a pre-registration clerk) and plaintiff had each recorded electronic "notes" about their

---

[150] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 261-78, 285-86.

[151] *Id.*

[152] *Id.* at 286, 270-73; doc. no. 26-14 (Declaration of David Davis) ¶¶ 14-15.

[153] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 227-29, 273.

[154] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 286; doc. no. 26-5 (England E-Mail), at 17; doc. no. 26-12 (Deposition of Melinda England), at 82-83.

work in the computer data files of the account.[155]

Specifically, Kayla Aldridge had written a "note" stating: "It looks like [the amount of the debt] may be $12,000."[156]  It was plaintiff's duty as a customer service representative to *verify* that amount with defendant's employee Shauna Brink, Team Leader Melinda England, Manager of Patient Accounts David Davis, or Central Business Office Director Diane Myrick.[157]  Based on plaintiff's electronic "notes," Davis concluded that she had quoted the *unverified* $12,000 amount to the patient.[158]

As a result of the incorrect quotation, the patient overpaid her bill by $9,480.[159] Accordingly, Team Leader Melinda England e-mailed plaintiff instructions to "call [the] patient [and] apologize and explain that she will receive [a] refund check for the difference."[160]  Plaintiff did as England asked.[161]  Plaintiff testified that she received a disciplinary write-up.[162]  (Assuming the write-up still exists, it has not been submitted into evidence.)

---

[155] Doc. no. 26-8 (Deposition of David Davis, Part II), at 318-24.

[156] *Id.* at 319 (alteration supplied).

[157] *Id.* at 320-21; doc. no. 26-10 (Deposition of Diane Myrick), at 133-34; doc. no. 26-14 (Declaration of David Davis) ¶ 16.

[158] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 287; doc. no. 26-8 (Deposition of David Davis, Part II), at 318-26; doc. no. 26-14 (Declaration of David Davis) ¶ 16.

[159] Doc. no. 26-5 (England E-Mail), at 17.

[160] *Id.* (alterations supplied).

[161] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 286-87.

[162] *Id.* at 290-91.

Plaintiff blamed the incorrect quotation on six white coworkers, none of whom were disciplined for the incident.[163]   At her *deposition*, plaintiff alleged that the quotation "came from [Team Leader] Melinda England, Rose Patterson . . . Shauna Brink[,] and Lindsey Garner."[164]   In her *declaration*, plaintiff asserted that the quotation "was actually given to the patient by Belinda Gotcher, Kayla Aldridge, and Shanna [sic] Brink."[165]   (Patterson, Brink, Gardner, Gotcher, and Aldridge appear to be "casual" employees.[166]) Further, plaintiff testified that Lindsey Gardner misquoted the amount of a patient's debt on another occasion in 2010, but was not disciplined.[167]

## M.   Allegation that Plaintiff Discussed the Patient Account of a Coworker's Husband at a Departmental Staff Meeting

Some customer service representatives had relatives who were patients at Russellville Hospital.[168]   In order to prevent those employees from violating the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) ("HIPAA"), defendant prohibited those representatives from

---

[163] *See* doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 400-05; doc. no. 26-8 (Deposition of David Davis, Part II), at 318-24.

[164] *Id.* at 289 (alterations supplied).  The parties spell the first name of Shauna Brink as, *e.g.*, "Shauna" and "Shanna," and the last name of Lindsey Gardner as, *e.g.*, "Gardner" and "Garner." This court will refer to the employees as Shauna Brink and Lindsey Gardner, with apologies if those spellings are not correct.

[165] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 32.

[166] *See* doc. no. 26-8 (Deposition of David Davis, Part II), at 318-24.

[167] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 400-05.

[168] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 295-301.

handling their relatives' patient accounts.[169]

Plaintiff alleged that Belinda Gotcher (who performed both customer service and cashier duties) had disobeyed defendant's policies by marking her husband's account as "cleared" of a past-due debt.[170]  When an account is "cleared," it does not necessarily mean that it has been paid in full or the debt forgiven; instead, the term indicates that the patient has been called, and that defendant has received a payment, a promise to pay, or a refusal to pay.[171]

Plaintiff spoke about the account of Gotcher's husband during a customer service meeting on May 17, 2010.[172]  The meeting was attended by Manager of Patient Accounts *David Davis*, Team Leader *Melinda England*, Customer Service Representatives *Carlette Robinson* and *Shirley Cross*, and, possibly, by other customer service employees.[173]  The parties offered two different versions of what occurred.  Davis alleged that, during the "open meeting," plaintiff asked whether

---

[169] Doc. no. 26-12 (Deposition of Melinda England), at 127-29; doc. no. 26-13 (Deposition of Rose Hale), at 28-30.

[170] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 295-301.  In the interests of privacy, the parties generally refer to Gotcher as "BG."  *See, e.g.*, *id.* at 308.

[171] Doc. no. 26-8 (Deposition of David Davis, Part II), at 178-79; doc. no. 26-10 (Deposition of Diane Myrick), at 251-53, 263.

[172] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 293-99, doc. no. 26-8 (Deposition of David Davis, Part II), at 153-54; doc. no. 26-14 (Declaration of David Davis) ¶ 17.

[173] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 293-99, doc. no. 26-8 (Deposition of David Davis, Part II), at 153-54; doc. no. 26-14 (Declaration of David Davis) ¶ 17.

Gotcher "should . . . have touched her own husband's account."[174]  Davis answered that the meeting was not the proper forum to discuss that issue.[175]

In contrast, plaintiff alleged that, during the open meeting, she asked only whether "we still cleared accounts."[176]  Then, as her coworkers "were going out of the room," she asked Davis whether employees should access their family members' accounts, and suggested that Davis speak to Gotcher about the matter.[177]  Plaintiff denied that Davis told her that the meeting was not the proper forum to discuss the Gotcher account.[178]

Gotcher, who did not attend the meeting, learned about plaintiff's statements from others.[179]  Plaintiff contends that Gotcher heard a false version of the statements from Central Business Officer Director Diane Myrick.[180]  However, the exhibit plaintiff cites does not support that contention, because it is merely a page from a "Manager File" that discusses the incident and bears Myrick's signature.  There is no evidence that the file was shared with Gotcher.  In any event, Gotcher complained

---

[174] Doc. no. 26-8 (Deposition of David Davis, Part II), at 163.

[175] Doc. no. 26-14 (Declaration of David Davis) ¶ 17.

[176] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 294.

[177] *Id.* at 297, 324.

[178] *Id.* at 299.

[179] *Id.* at 300-01; doc. no. 26-14 (Declaration of David Davis) ¶ 20; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 7.

[180] Doc. no. 47 (Brief in Response to Motion for Summary Judgment), at 25 (citing doc. no. 36-12 (Manager File), at 2).

about plaintiff to Myrick and Davis; Myrick instructed plaintiff to apologize to Gotcher; and plaintiff did as she was directed.[181]

Myrick and Davis alleged that plaintiff's conduct was wrong for two reasons. First, according to David Davis, plaintiff violated the HIPAA rule "which says that unless you have a business need to know about an account, you are not to look at an account or discuss one, and in that situation, no one in that room had a business need to know about that situation."[182]   Second, and again according to David Davis, plaintiff "embarrassed [Gotcher] in front of her fellow employees."[183]   In support of that belief, Davis observed that plaintiff could have asked the same question about handling the account of a spouse without identifying Gotcher or her husband by name.[184]

In any event, Gotcher was not reprimanded for "clearing" her husband's account.[185]   Plaintiff alleged that "[t]he real problem was [that Gotcher] had been

---

[181]   Doc. no. 26-8 (Deposition of David Davis, Part II), at 278; doc. no. 26-14 (Declaration of David Davis) ¶ 20; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 7.

[182]   Doc. no. 26-8 (Deposition of David Davis, Part II), at 166; *see also id.* at 154-71, 175-77, 189, 199-202; doc. no. 26-10 (Deposition of Diane Myrick), at 264-65, 276-278, 281, 287-91.

[183]   Doc. no. 26-8 (Deposition of David Davis, Part II), at 172 (alteration supplied); *see also id.* at 166-67, 172-73; doc. no. 26-14 (Declaration of David Davis) ¶ 17; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 8.

[184]   Doc. no. 26-8 (Deposition of David Davis, Part II), at 169.

[185]   Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 301-10; doc. no. 26-11 (Deposition of Cheryl Lee), at 78-82.

caught 'clearing' her husband's account, but because [Gotcher] is white, [plaintiff], [who is] black, was made a scapegoat to cover for [Gotcher]."[186]

## N.   Allegation That Plaintiff Hung Up on a Patient in the Middle of a Conversation

On May 18, 2010 — the day after the staff meeting discussed above — a patient complained that an employee hung up on him in the middle of a conversation.[187]   After reviewing the computer records for the patient's account, Manager of Patient Accounts *David Davis* determined that plaintiff was the only customer service representative who spoke to the patient on that day.[188]

Plaintiff was not aware of the exact content of the patient's complaint with regard to the telephone call.[189]   Even so, plaintiff denied that she hung up on a patient in the middle of a conversation, and blamed the incident on unknown individuals employed by unnamed outside debt collection agencies.[190]

## O.   Allegation that Plaintiff Discussed the Patient Account of a Coworker's Husband in a Group E-mail

On May 19, 2010 — two days after the departmental staff meeting during

---

[186] Doc. no. 47 (Brief in Response to Motion for Summary Judgment), at 24 (alterations supplied) (citing doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton), at 12-13, 22-23, 26-27).

[187] Doc. no. 26-14 (Declaration of David Davis) ¶ 19.

[188] *Id.*

[189] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 327-28.

[190] Doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶¶ 38-40.

which plaintiff discussed the issue of Belinda Gotcher's act of allegedly "clearing" her husband's account — plaintiff sent an e-mail to approximately twelve people that again discussed the account of Gotcher's husband, and, included the names of both Belinda Gotcher and her husband.[191] The recipients of the e-mail included Central Business Office Director *Diane Myrick*, Manager of Patient Accounts *David Davis*, defendant's employee *Shauna Brink*, and all members of the Revenue Integrity Specialist Team and Central Business Office Management Team.[192]

Like the comments attributed to plaintiff at the May 17th customer service staff meeting, plaintiff's May 19th e-mail addressed the issue of whether representatives were supposed "to work up family members['] accounts."[193] Central Business Office Director Diane Myrick and Manager of Patient Accounts David Davis deemed the e-mail a second violation of HIPAA privacy rules, because plaintiff could have asked her question about the duties of customer service representatives without using the names of Gotcher and her husband.[194]

## P.    Plaintiff's Suspension and Termination

---

[191] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 301-07; doc. no. 26-5 (Hamilton E-Mail), at 18-19; doc. no. 26-14 (Declaration of David Davis) ¶ 18; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 9.

[192] Doc. no. 26-5 (Hamilton E-Mail), at 18.

[193] *Id.* (alteration supplied).

[194] Doc. no. 26-8 (Deposition of David Davis, Part II), at 154-71, 175-77, 189, 199-202; doc. no. 26-10 (Deposition of Diane Myrick), at 263-65, 276-278, 281, 287-91.

On May 21, 2010, four days after plaintiff sent the foregoing e-mail, Central Business Office Director *Diane Myrick*, Manager of Patient Accounts *David Davis*, and Human Resources Director *Cheryl Lee* jointly made the decision to suspend plaintiff.[195]  To reach her decision, Cheryl Lee relied:  on conversations with plaintiff, Myrick, Davis, Team Leader Melinda England, and Human Resources Coordinator Kim Cole; on documentation from Myrick, Davis, England, and defendant's employee Melinda Gotcher; and on notes from the meeting at which plaintiff allegedly discussed the confidential patient information of Gotcher's husband.[196]

A notice of suspension was issued to plaintiff on May 21, 2010.[197]  In the spaces provided to explain the reasons for that action, "confidentiality" and "performing poor work" were marked.[198]  Specifically, the notice stated:

> [Plaintiff] committed a HIPAA violation by discussing an employee's husband's account verbally in a meeting and by e-mail to persons without a business need to know.  [Plaintiff] has also shown no improvement through her Performance Improvement Evaluation period.
>
> Suspension beginning today until HIPAA violation is investigated.  Productivity and patient response will be taken into

---

[195] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 347-50; doc. no. 26-11 (Deposition of Cheryl Lee), at 54-55, 66-71; doc. no. 26-8 (Deposition of David Davis, Part II), at 150-52; doc. no. 26-10 (Deposition of Diane Myrick), at 176-77.

[196] Doc. no. 26-11 (Deposition of Cheryl Lee), at 69, 73.

[197] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 214, doc. no. 26-5 (Notice of Suspension), at 21; doc. no. 26-14 (Declaration of David Davis) ¶¶ 18, 21.

[198] Doc. no. 26-5 (Notice of Suspension), at 21.

consideration.[199]

In the section entitled "employee comments," plaintiff responded:

> Didn't hang up on Mr. John Doe . . . He continued to talk about his health situation.  I listen but as I offered FC [presumably, financial counseling] and at the end I concluded the call.[200]  I did not quote wrong price to pt [presumably, patient].[201]  Several clerks spoke to pt.  I should not have given acct. [presumably, account] name.  I only did because at other times the acct. names have been brought by the group.[202]

After meeting with plaintiff to discuss her suspension, Central Business Office Director *Diane Myrick* and Manager of Patient Accounts *David Davis* recommended to Human Resources Director *Cheryl Lee* that plaintiff be fired.[203]  Myrick and Davis identified four reasons in favor of termination:  *i.e.*, plaintiff's failure to improve her productivity while she was on a performance improvement plan; her discussion of the patient account of a co-worker's husband in a departmental staff meeting and subsequent e-mail; the fact that she hung up on a patient in the middle of a conversation; and the fact that she misquoted a patient's debt by a significant

---

[199] *Id.* (alterations supplied).

[200] *Nota bene* that this admission that plaintiff spoke with the customer who complained about her hanging up on him is not consistent with her denials discussed in Part III(N), *supra*.

[201] *See also* Part III(L), *supra*, discussing the allegation that plaintiff misquoted the *unverified* amount of a patient's account by more than $9,000.

[202] *Id.* (ellipses in original) (alterations supplied).

[203] Doc. no. 26-10 (Deposition of Diane Myrick), at 176-77; doc. no. 26-14 (Declaration of David Davis) ¶¶ 18-22; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 10.

amount.[204]

Upon receiving the recommendation of termination, Human Resources Director Cheryl Lee reviewed:  plaintiff's personnel file; documentation from Diane Myrick and David Davis; and information from Team Leader *Melinda England* and defendant's employee *Belinda Gotcher*.[205]  (The information provided by England consisted of e-mails regarding the allegations that plaintiff misquoted the amount of a patient's debt and failed to service an account.[206]  England's e-mails were included in documentation given to Lee by Davis and placed in plaintiff's personnel file.[207])

Human Resources Director Cheryl Lee approved the recommendation of Myrick and Davis that plaintiff be terminated on May 27, 2010.[208]  Other than drafting the e-mails given to Lee by Davis, Melinda England did not participate in Lee's decision-making process.[209]

## Q.    Plaintiff's Appeal of the Termination Decision

---

[204] Doc. no. 26-8 (Deposition of David Davis, Part II), at 148-52; doc. no. 26-10 (Deposition of Diane Myrick), at 176-77; doc. no. 26-14 (Declaration of David Davis) ¶¶ 16-22; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 10.

[205] Doc. no. 26-11 (Deposition of Cheryl Lee), at 54-55, 57, 66-71, 90-92.

[206] Doc. no. 26-16 (Declaration of Cheryl Lee) ¶ 4.

[207] *Id.*

[208] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 333-35; doc. no. 26-11 (Deposition of Cheryl Lee), at 54-55, 57, 66-71, 90-92.

[209] Doc. no. 26-12 (Deposition of Melinda England), at 61-63; doc. no. 26-17 (Declaration of Melinda England) ¶ 4.

Plaintiff appealed her termination in accordance with defendant's "five-step problem-solving procedure," which was described in defendant's Employee Handbook as follows:

> Step 1: An Employee should make every reasonable effort to work out with their immediate supervisor any grievance or matter that merits discussion.  This is most successful when the matter is fresh in the minds of everyone; therefore, a written grievance must be presented within five working days after the incident.· The supervisor will discuss the complaint with the employee within three workdays or within a reasonable time from the time he/she is made aware of the complaint. The supervisor will reply to the employee within five workdays or a reasonable time, stating the action taken on the complaint.

> Step 2:  If after receiving the answer from the supervisor, the matter is not resolved, the employee should submit a written complaint to the Department Manager and the Human Resources Director. This contact must be made within three workdays after receiving the decision of the supervisor.  Within five working days or a reasonable time from receiving the appeal from the first step, the Department Manager and the supervisor will meet the employee in an effort to resolve the complaint. A written reply will be given by the Department Manager within five days or a reasonable time following the meeting.

> Step 3:  If after receiving the reply from the Department Manager, the matter is not resolved, the employee should submit a written complaint to the appropriate Administrative representative, the Facility Administrator and the Human Resources Director within three working days after receiving the reply from the Department Manager.  Within ten workdays after receiving the complaint, the appropriate Administrative representative will meet with the employee and the appropriate supervisors.  A written reply will be given to the employee within ten workdays or a reasonable time from the review of the complaint.

> Step 4:  If after receiving the response from the Administrative

Representative the matter is not resolved, the employee should submit a written complaint to the Chief Operating Officer (COO) or Chief Financial Officer (CFO), whichever is applicable, within three working days after receiving the reply from the Administrative Representative. Within ten working days after receiving the complaint, the COO/CFO will meet with the employee and the appropriate supervisors to review the complaint. A written reply will be given to the employee within ten working days or a reasonable time from the review of the comp [sic].

Step 5: Appeals following the steps outlined above may be made by submitting the complaint, in writing, within three working days, to the President/Chief Executive Officer (CEO) and the Human Resources Director. Within ten working days or a reasonable time after receiving the complaint, the President/CEO will review the complaint with the employee and the appropriate supervisors. A written reply will be given to the employee within ten working days or within a reasonable time from the review of the complaint. The decision of the President/CEO shall be the final decision.

Note: If any of the above listed steps are not applicable to your reporting structure, proceed to the next appropriate step to begin the problem solving procedure.[210]

Defendant was in the process of selling the hospital during plaintiff's pursuit of her appeal rights.[211] Even so, plaintiff and defendant completed all except the fifth step of the "problem-solving procedure": *i.e.*, a meeting with the president or chief executive officer.[212] Human Resources Director *Cheryl Lee* sent plaintiff a letter upholding the termination decision in the absence of such a meeting on July 27, 2010,

---

[210] *Id.* at 342, doc. no. 26-3 (Employee Handbook), at 101; doc. no. 26-5 (Lee Letter), at 26, doc. no. 26-11 (Deposition of Cheryl Lee), at 18-24.

[211] Doc. no. 26-11 (Deposition of Cheryl Lee), at 44-49, 60.

[212] *Id.*

saying that

> when you and I last talked on the telephone in June, 2010, the hospital was in the final stages of being sold to Regional Care Hospital Partners. At that time, [Interim CEO Jody] Pigg was heavily involved in the process and was frequently out of town and unavailable locally in completion of the sale.  Mr. Pigg resigned as CEO of the hospital at the end of June and is no longer employed by the hospital in that position. In light of Mr. Pigg's departure and the change of ownership, we are unable to proceed further.

> After further review and consideration of your appeal, I am supportive of the prior decision to terminate your employment. Accordingly, the problem solving process is concluded at this step.[213]

Plaintiff alleged that defendant "replaced [Interim Chief Executive Officer] Jody Pigg," and that plaintiff "could have had her right to appeal honored."[214]  In support, plaintiff offered a string of citations, none of which stated that Pigg was "replaced," as opposed to voluntarily resigning his position.[215]

## R.    Plaintiff's Replacement

Defendant replaced plaintiff with Jerica Pace, a white female.[216]  Pace was herself fired on October 12, 2010, however, because she was not able to meet

---

[213] Doc. no. 26-9 (Lee Letter), at 47; doc. no. 26-11 (Deposition of Cheryl Lee), at 47-48.

[214] Doc. no. 47 (Brief in Response to Motion for Summary Judgment), at 31 (alteration supplied).

[215] *See id.* (citing doc. no. 26-3 (Employee Handbook), at 101-02; doc. no. 26-7 (Deposition of David Davis, Part I), at 77-82; doc. no. 26-9 (Appeal Letters), at 46-49; doc. no. 26-11 (Deposition of Cheryl Lee), at 18-35, 42-49, 60, 83-84.

[216] Doc. no. 26-14 (Declaration of David Davis) ¶ 23.

productivity requirements.[217]

## IV.  PLAINTIFF'S RETALIATION CLAIM

Title VII's "opposition clause" protects an employee who "oppose[s] any practice made an unlawful employment practice."  42 U.S.C. § 2000e–3(a); *see also Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

Prior to commencing a lawsuit based upon any portion of Title VII, a plaintiff must first file an administrative charge of discrimination with the EEOC.  *See, e.g., Gregory v. Georgia Department of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460 (5th Cir. 1970)[218]).  Defendant's motion for summary judgement asserts that plaintiff failed to exhaust her administrative remedies with respect to her retaliation claim because, when filing her EEOC charge of discrimination, plaintiff did not check the box for retaliation, and did not allege that defendant had retaliated against her for engaging in protected conduct.[219]

---

[217] *Id.*

[218] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[219] Doc. no. 25 (Brief in Support of Motion for Summary Judgment), at 20-21; *see also* doc. no. 1 (Complaint), at 9.  As noted in footnote 4, *supra*, the EEOC charge appears as page 9 of plaintiff's complaint, rather than as a separate exhibit.

In response, plaintiff argues that she stated a claim for retaliation in her *EEOC intake questionnaire.*[220]   While it is true that plaintiff marked the box for retaliation on the *questionnaire*, she did not describe the protected conduct in which she allegedly had engaged, and for which defendant allegedly retaliated against her, and she did not indicate the dates on which she allegedly engaged in such protected conduct.[221]

The Eleventh Circuit has held that "a verified intake questionnaire *that includes the basic information suggested by 29 C.F.R. § 1601.12(a)* may constitute a charge for purposes of . . . Title VII[.]"  *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1321 (11th Cir. 2001) (emphasis and alteration supplied).  The regulatory provision cited in that case, 29 C.F.R. § 1601.12(a), requires, among other things, "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices."  29 C.F.R. § 1601.12(a)(3) (alteration supplied). Thus, plaintiff failed to exhaust the administrative remedies for her retaliation claim.

To overcome that defect, plaintiff argues that she brings her complaint under both Title VII and 42 U.S.C. § 1981.[222]   Section 1981 contains no administrative

---

[220] Doc. no. 47 (Brief in Response to Motion for Summary Judgment), at 47 (citing doc. no. 26-5 (EEOC Intake Questionnaire), at 33-36).

[221] *See* doc. no. 26-5 (EEOC Intake Questionnaire).

[222] Doc. no. 47 (Brief in Response to Motion for Summary Judgment), at 46.

exhaustion requirement.[223]  However, neither plaintiff's complaint, nor the attached charge of discrimination, contain a reference to 42 U.S.C. § 1981.[224]  Instead, the EEOC charge of discrimination specifically refers to only Title VII and the ADEA.[225] Further, the complaint includes claims "for racial and age *discrimination*"; it does not include the word "retaliation"; it does not specify plaintiff's allegedly protected conduct; and it does not state the dates on which she voiced her opposition to defendant's allegedly unlawful employment practices.[226]  Therefore, regardless of whether plaintiff proceeds under Title VII or § 1981, her complaint does not state a cognizable claim for retaliation.

To convince this court to apply the liberal standard for *pro se* pleadings, plaintiff argues that she "was unrepresented when she filed her EEOC Charge, EEOC Questionnaire, and Complaint," and that "[t]his Court ordered that [she] could not amend her Complaint."[227]

While plaintiff was indeed *pro se* until *June 13*, *2011*, the date on which her

---

[223] *Id.*

[224] *See* doc. no. 1 (Complaint).

[225] *Id.* at 9.

[226] Doc. no. 1 (Complaint), at 6 (emphasis supplied).

[227] Doc. no. 47 (Brief in Response to Motion for Summary Judgment), at 46 (citing doc. no. 48-1 (Original Declaration of Sheryl Leggs Hamilton) ¶ 2); *id.* at 46 n.11 (alterations supplied) (citing doc. no. 16 (Scheduling Order), at 1).

attorney filed a notice of appearance,[228] the court's scheduling order allowed plaintiff *and her retained attorney* until *August 1st* of the same year to file an amendment to her complaint.[229]  Thus, plaintiff had, *with the assistance of counsel*, more than one month in which to amend her complaint for the purpose of stating a claim for retaliation.

Therefore, for all of the reasons discussed above, this court will enter summary judgment in favor of defendant on plaintiff's purported retaliation claim.

## V.  PLAINTIFF'S DISCRIMINATION CLAIM FOR HER DISCIPLINE, SUSPENSION, AND TERMINATION

Title VII prohibits an employer from discriminating "against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (alteration supplied).  As plaintiff does not rely upon direct evidence of discrimination, the court will apply the framework for assessing claims that are based on circumstantial evidence.  Under that framework, the employee bears the initial burden of stating a *prima facie* case of the employer's intent to discriminate on the basis of the employee's protected characteristic — here, plaintiff's race.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See*

---

[228] *See* doc. no. 11 (Notice of Appearance).

[229] Doc. no. 16 (Scheduling Order), at 1.

*also, e.g., St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the employee does so, the *prima facie* case gives rise to "a presumption that the employer unlawfully discriminated against [her]." *Burdine*, 450 U.S. at 254 (alteration supplied).

The employer then bears the burden of producing, but not proving, a legitimate, nondiscriminatory reason for the challenged employment action. *See McDonnell Douglas*, 411 U.S. at 802. "If the [employer] carries this burden of production, the presumption raised by the *prima facie* case is rebutted," *Burdine*, 450 U.S. at 255, and "drops from the case." *Id.* at 255 n.10 (alteration supplied).

Finally, at the third step of the analytical progression, the employee "has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted).

## A.    Plaintiff's *Prima Facie* Case

In discharge situations, courts generally require a plaintiff to demonstrate that: (1) she was a member of a class of persons protected by the statute; (2) she was

qualified for the position from which she was discharged; (3) she was, nevertheless,

terminated; and (4) following her discharge, the defendant either replaced the plaintiff

with someone outside her protected class, or retained other employees who were not

within the protected class, and, who possessed comparable or lesser qualifications.

*See*, *e.g.*, *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6

(11th Cir. 1998);[230] *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181,

---

[230] The Eleventh Circuit held in *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989), a case in which a black police officer was suspended as discipline for unauthorized use of a police vehicle, but white police officers who allegedly had committed similar offenses received lesser discipline, or no discipline at all, that

> in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Id.* at 1540. That holding was questioned in the case accompanying this footnote: *i.e.*, *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306 (11th Cir. 1998), a case in which a black, female licensed practical nurse was discharged for violation of work-rules (*i.e.*, failing to wear required uniform to work, and failing to follow a supervisor's instructions), while white employees allegedly were treated more favorably for similar conduct. The Eleventh Circuit wrote:

> Considering the facts in *Jones* [*v. Gerwens*], our impression is that words about "did not violate the work rule" are unnecessary to the decision in *Jones* and are dicta; but we will discuss them. The pertinent words in *Jones* demand not two, but three elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged — either (a) disputedly or (b) admittedly — in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment.

> We stress that, under the *Jones* formulation, no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not

1185 (11th Cir. 1984); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980).

None of those elements are disputed. Plaintiff is an African-American; she was qualified for the position of customer service representative; she was disciplined, suspended and ultimately fired; and she was replaced by Jerica Pace, a white female.[231] Accordingly, defendant acknowledges that plaintiff "can establish a *prima facie* case related to her termination for purposes of summary judgment."[232]

## B.   Defendant's Allegedly Legitimate, Non-Discriminatory Reasons

Defendant identified four reasons for plaintiff's discipline, suspension, and termination:   *i.e.*, her failure to improve her productivity while she was on a performance improvement plan; her discussion of the patient account of a coworker's husband in a departmental staff meeting and subsequent e-mail; the fact that she hung up on a patient during a telephone conversation; and the fact that she misquoted a

---

violate her employer's work rule.  The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better.

*Id.* at 1311 n.6.

   [231] *See* doc. no. 25 (Brief in Support of Motion for Summary Judgment), at 22.  In its discussion of the *prima facie* case of discrimination, defendant states only that plaintiff "was replaced by a younger individual," without specifying the race of that individual.  *Id.*  Earlier, however, defendant described plaintiff's replacement as "Caucasian."  *Id.* at 17 (citing Declaration of David Davis) ¶ 23).

   [232] Doc. no. 25 (Brief in Support of Motion for Summary Judgment), at 22.

patient's debt by a significant amount.[233]  Therefore, defendant has carried its burden of production, and the burden shifts back to plaintiff "to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action." *Combs*, 106 F.3d at 1528 (citations omitted).

## C.   Pretext

Plaintiff may prove that a defendant's stated reasons for its actions are pretextual in two ways:  "either *directly* by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly* by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (emphasis supplied) (citing *McDonnell Douglas*, 411 U.S., at 804-05).[234]

### 1.   Direct evidence of pretext

---

[233] Doc. no. 26-8 (Deposition of David Davis, Part II), at 148-52; doc. no. 26-10 (Deposition of Diane Myrick), at 176-77; doc. no. 26-14 (Declaration of David Davis) ¶¶ 16-22; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 10.

[234] Direct evidence of *pretext* is a distinct concept from direct evidence of *discrimination*. For example, a plaintiff may submit discriminatory statements as evidence of pretext, despite the fact that they are "not direct evidence of discrimination because they are either too remote in time or too attenuated." *Jackson v. City of Centreville*, No. 7:09-CV-2115-SLB, 2012 WL 4482391, *47-48 (N.D. Ala. Sept. 24, 2012) (citing *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291-92 (11th Cir. 1998)).  Such statements "may provide circumstantial evidence that, when read in conjunction with the entire record, show a decision-maker's discriminatory attitude ." *Jackson*, 2012 WL 4482391, at * 47-48 (citing *Ross*, 146 F.3d at 1291-92).

Plaintiff does not characterize the evidence she offers to contradict defendant's stated reasons as either direct or indirect evidence of pretext. Even so, she makes two allegations that arguably constitute attempts to establish direct evidence of pretext. First, plaintiff claims that Team Leader *Melinda England* came to work with a tag depicting the confederate flag on the front bumper of her automobile at some point in 2007 — *i.e.*, *three years before plaintiff's termination*.[235]   Second, plaintiff contends that Manager of Patient Accounts *David Davis* yelled at her for arriving late to a company meeting on January 12, 2010, saying: "You hurry up. You need to get in here. As African-Americans, y'all are always running late. You just need to hurry up and get on in here because class has already started."[236]

With regard to Team Leader Melinda England's tag, Human Resources Director Cheryl Lee testified, without contradiction, that:  England drafted several e-mails regarding the allegations that plaintiff misquoted the amount of a patient's debt and failed to service an account; England's e-mails were included in documentation given to Lee by Davis and placed in plaintiff's personnel file; and England had no other input into the decision to discipline, suspend, or terminate plaintiff's

---

[235] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 413-14; doc. no. 26-12 (Deposition of Melinda England), at 34-40; doc. no. 26-17 (Declaration of Melinda England) ¶ 3.

[236] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 239-41, 448-50.  Not surprisingly, Davis denied making the comment about "African-Americans . . . . always running late."  Doc. no. 26-7 (Deposition of David Davis, Part I), at 75-76.

employment.[237]  "[C]omments by non-decisionmakers do not raise an inference of discrimination, *especially if those comments are ambiguous*." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355 (11th Cir. 1999) (emphasis and alteration supplied).

Furthermore, another court within this Circuit has said that the display of a confederate flag by a coworker is "not *necessarily* even related to race." *Gonzalez v. Florida Department of Highway Safety*, 237 F. Supp. 2d 1338, 1354-55 (S.D. Fla. 2002) (emphasis supplied).  Thus, because Melinda England was not a decision-maker, and the precise message that was intended to be conveyed by her car tag was ambiguous, it does not constitute direct evidence of pretext.

With regard to the allegation that Manager of Patient Accounts David Davis said "African-Americans . . . are always running late," that comment was made five months prior to plaintiff's termination.  Hence, it was not temporally related to the decisions to suspend and, ultimately, terminate plaintiff.  Although a comment unrelated to a termination decision may *contribute* to a circumstantial case for pretext, *see Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286 (11th Cir. 1998), it will usually not be sufficient, absent some additional evidence, to alone support a finding of pretext. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002); *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002).  Furthermore, plaintiff was

---

[237] Doc. no. 26-16 (Declaration of Cheryl Lee) ¶ 4.

not disciplined, suspended, or terminated for *tardiness*.[238]  Accordingly, this court will

follow the rule that a comment unrelated to a basis for a termination decision is

"insufficient to create an inference of pretext when standing alone."  *Beckles v.*

*Federal Express Corp.*, 489 F. App'x 380, 384 (11th Cir. 2012) (citing *Scott*, 295

F.3d at 1229-30; *Rojas*, 285 F.3d 1339, 1343).

## 2.    Circumstantial ('indirect") evidence of pretext

The following sections will address each of the four reasons cited by defendant

for plaintiff's discipline, suspension, and termination.  Before doing so, however, the

Eleventh Circuit's admonitions in *Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir.

2000), need to be reviewed.

A plaintiff is not allowed to recast an employer's proffered
nondiscriminatory reasons or substitute his business judgment for that
of the employer.  Provided that the proffered reason is one that might
motivate a reasonable employer, an employee must meet that reason
head on and rebut it, and *the employee cannot succeed by simply*
*quarreling with the wisdom of that reason*.  *See Alexander v. Fulton*
*County, Ga.*, 207 F.3d 1303, 1341 (11th Cir.2000) (Title VII case) ("It
is not the court's role to second-guess the wisdom of an employer's
decisions as long as the decisions are not racially motivated."); *Combs*,
106 F.3d at 1541-43.  We have recognized previously and we reiterate
today that:

federal courts "do not sit as a super-personnel department
that reexamines an entity's business decisions.  No matter
how  medieval  a  firm's  practices,  no  matter  how

---

[238] *See* Section II(D)(2), *supra* (discussing defendant's proffered reasons).

> high-handed its decisional process, no *matter how mistaken
> the firm's managers*, the ADEA does not interfere.  Rather
> our inquiry is limited to whether the employer gave an
> honest explanation of its behavior."

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted)); *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984) (An "employer may fire an employee for a good reason, a bad reason, *a reason based on erroneous facts*, or for no reason at all, as long as its action is not for a discriminatory reason."); *Abel v. Dubberly*, 210 F.3d 1334, 1339 n. 5 (11th Cir.2000).  We "do not … second-guess the business judgment of employers."  *Combs*, 106 F.3d at 1543; *accord Alexander*, 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law.  We are not in the business of adjudging whether employment decisions are prudent or fair." (internal citation omitted)).

*Chapman*, 229 F.3d at 1030 (footnote omitted) (emphasis supplied).

### a.    Allegation that plaintiff failed to improve her productivity while she was on a performance improvement plan

Plaintiff contends that her performance evaluations were either a "sham," or "incorrect" measures of her true achievements.[239]  She argues that pre-registration clerks undermined her performance by failing to properly prepare her accounts for processing.[240]  Nevertheless, she has offered no evidence to refute defendant's

---

[239] *See* doc. no. 47 (Brief in Response to Motion for Summary Judgment) at, *e.g.*, 16-21.

[240] *See* doc. no. 47 (Brief in Response to Motion for Summary Judgment) at, *e.g.*, 16-21.

testimony that any problems with the quality of the pre-registration process would have impacted all customer service representatives equally.[241]   Claims based "on either unexplained or illogical inferences" are not evidence of pretext.   *Colley v. Waste Management of Alabama, Inc.*, No. 99-1110-CB-S, 2001 WL 228058, *15 (S.D. Ala. Feb. 7, 2001).

Moreover, plaintiff has offered no evidence to rebut the testimony that her productivity reports were either pulled directly from the automated computer system, or prepared by Recita Flie, another African-American employee of defendant.[242]

More importantly, plaintiff has not refuted the evidence indicating that Central Business Office Director Diane Myrick and Manager of Patient Accounts David Davis *honestly believed* that plaintiff had failed to improve her productivity on the basis of a comparison of plaintiff's productivity reports with those of her co-workers.[243]   "With respect to the issue of job performance, the question is whether [the decision-maker] *had a good faith belief* that plaintiff's job performance was subpar." *Alexander v. Baldwin County Board of Education*, No. 07-0333-CB-C, 2008

---

[241] Doc. no. 26-8 (Deposition of David Davis, Part II), at 292-94; doc. no. 26-12 (Deposition of Melinda England), at 122-24, 137; doc. no. 26-14 (Declaration of David Davis) ¶ 13; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 6.

[242] Doc. no. 26-5 (Performance Evaluation), at 1, 4; doc. no. 26-8 (Deposition of David Davis, Part II), at 235; doc. no. 26-14 (Declaration of David Davis) ¶ 11.

[243] Doc. no. 26-8 (Deposition of David Davis, Part II), at 148-52; doc. no. 26-10 (Deposition of Diane Myrick), at 176-77; doc. no. 26-14 (Declaration of David Davis) ¶¶ 10-24; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 10.

WL 3551194, * 17 (S.D. Ala. Aug. 12, 2008) (emphasis and alteration supplied) (citing *Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000)).

Thus, plaintiff has not established that defendant's first reason was a pretext for racial discrimination.

> **b.    Allegation that plaintiff discussed the patient account of a coworker's husband in a departmental staff meeting and subsequent e-mail**

Plaintiff admits to discussing the patient account of a coworker's husband on two occasions:  first, as her coworkers "were going out of the room" at the end of a departmental staff meeting;[244] and, subsequently, in an e-mail transmitted to twelve other employees.[245]  Plaintiff has offered no evidence to rebut the evidence indicating that Diane Myrick and David Davis *honestly believed* that plaintiff violated the privacy requirements of the Health Insurance Portability and Accountability Act of 1996.[246]  Likewise, plaintiff has not rebutted the evidence indicating that Myrick and Davis *honestly believed* that plaintiff "embarrassed [a co-worker] in front of her

---

[244] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 297, 324.

[245] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 301-07; *see also* doc. no. 26-5 (Hamilton E-Mail), at 18-19.

[246] Doc. no. 26-8 (Deposition of David Davis, Part II), at 166; *see also id.* at 154-71, 175-77, 189, 199-202; doc. no. 26-10 (Deposition of Diane Myrick), at 264-65, 276-278, 281, 287-91.

fellow employees."[247]   Therefore, plaintiff has not established that defendant's second reason was a pretext for racial discrimination.

### c.   Allegation that plaintiff hung up on a patient

Plaintiff denies that she hung up on a patient in the middle of a telephone conversation.[248]   Even so, plaintiff has not rebutted the testimony that David Davis formed the *honest belief* that plaintiff had done so based upon his review of the computer records for the patient's account, and determination that plaintiff was the only customer service representative who spoke to the patient on that day.[249]   Thus, plaintiff has not shown that defendant's third reason was a pretext for discrimination.

### d.   Allegation that plaintiff misquoted the amount of a patient's debt

Plaintiff denies that she misquoted the amount of a patient's debt in response to an inquiry.[250]   Nevertheless, plaintiff has not refuted the testimony that David Davis *honestly believed* that plaintiff had done so based upon his review of the computer records for the patient's account, and determination that plaintiff had failed

---

[247] Doc. no. 26-8 (Deposition of David Davis, Part II), at 172 (alteration supplied); *see also id.* at 166-67, 172-73; doc. no. 26-14 (Declaration of David Davis) ¶ 17; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 8.

[248] *See* doc. no. 47 (Brief in Response to Motion for Summary Judgment) at, *e.g.*, 22-24, 27.

[249] *Id.*

[250] *See* doc. no. 47 (Brief in Response to Motion for Summary Judgment) at, *e.g.*, 22-24, 27.

to verify the mistaken quote of the account balance before giving it to the patient.[251] Instead, plaintiff argues that white "casual" employee Lindsey Gardner misquoted the amount of another patient's debt, but was not disciplined.[252]

At the summary judgment stage, an employer's assertion that an employee was fired for violating a "'work rule'. . . is arguably pretextual when [the employee] submits evidence (1) that [he or] she did not violate the cited work rule, or (2) that if [he or] she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Jordan v. Warehouse Services*, 81 F. Supp. 2d 1257, 1271 (M.D. Ala. 2000) (alterations in original) (quoting *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999)).

Under the second prong of the *Jordan* test, a plaintiff can avoid summary judgment by proving that if "she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Jordan*, 81 F. Supp. 2d at 1271.

> When a claim alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations and quotation marks omitted). When making that determination, "we require that the quantity and quality of the

---

[251] Doc. no. 26-8 (Deposition of David Davis, Part II), at 318-24.

[252] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 400-05.

> comparator's misconduct be nearly identical to prevent courts from
> second-guessing employers' reasonable decisions and confusing apples
> with oranges."   *Id.* (citation omitted); see also *Nix v. WLCY
> Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984)
> (requiring a plaintiff bringing a discriminatory discipline claim to show
> "that the misconduct for which he was discharged was nearly identical
> to that engaged in by an employee outside the protected class whom the
> employer retained") (citations, quotation marks, and alterations omitted).

*Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006).

Plaintiff has not established that she was subjected to discriminatory discipline because the gravity of plaintiff's misconduct far exceeds Lindsey Gardner's in "quantity and quality."   The record is devoid of evidence that Gardner (or, for that matter, any other employee):  failed to improve her productivity while she was on a performance improvement plan; *and* discussed the patient account of a coworker's husband in a departmental staff meeting and subsequent e-mail using the coworker and her husband's names; *and* hung up on a patient in the middle of a conversation; *and* misquoted a patient's debt *by more than $9,000.*  Thus, plaintiff has not shown that defendant's final reason was a pretext for discrimination.

## VI.  PLAINTIFF'S DISCRIMINATION CLAIM FOR ANY EVENTS OTHER THAN HER DISCIPLINE, SUSPENSION, AND TERMINATION

The parties recount a variety of other events that arguably constitute evidence of discrimination, including, *e.g.*:  plaintiff's 2007 reprimand for working an eleven-and-a-half-hour day on the Tuesday preceding the Thanksgiving holiday; her 2007

68

reprimand for improper collection practices; her 2009 discipline for sending an itemized bill to the wrong patient; and her 2010 discipline for reading a novel at work. Those incidents do not establish discrimination for multiple reasons. First, the incidents do not constitute "adverse employment actions." Title VII prohibits employment discrimination

> with respect to an employee's "compensation, terms, conditions, or privileges of employment." *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001) (quoting 42 U.S.C. § 2000e-2(a)). Courts have uniformly read this language to require a plaintiff to establish, as part of his *prima facie* case, that he suffered an "adverse employment action." *See id.* However, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Id.* In *Davis*, [the Eleventh Circuit] described an adverse employment action as follows:
>
>> [I]t is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job *in a real and demonstrable way*. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a *tangible adverse effect* on the plaintiff's employment . . . . [T]herefore, . . . to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material change* in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

> *Id.* at 1239.   *Criticisms, negative evaluations, and temporary and non-substantial changes in work assignments are not actions that have a "serious and material effect" on the terms and conditions of employment.* See *id.* at 1241-44.

*White v. Hall*, 389 F. App'x 956, 960 (11th Cir. 2010) (emphasis and first alterations supplied) (remaining alterations in original).

Second, plaintiff has abandoned her claims for incidents that occurred in 2007. Plaintiff objects to evidence regarding her 2007 reprimands for working an eleven-and-a-half-hour day on the Tuesday preceding the Thanksgiving holiday, and for improper collection practices, on the grounds that such evidence "is immaterial, irrelevant, and had nothing to do with" defendant's reasons for suspending plaintiff on May 21, 2010, and firing her on May 27, 2010, two and a half years later.[253]

With regard to plaintiff's 2009 discipline for sending an itemized bill to the wrong patient, plaintiff alleges that "casual" employee Gayle Burgess (who is white) and Customer Service Representative Carlette Robinson (who is African-American) were not disciplined for making the same mistake.[254]   Neither employee constitutes a proper comparator for two reasons.  First, Robinson, like plaintiff, is a member of the protected class of African-Americans.  *See, e.g., Jordan*, 81 F. Supp. 2d at 1271

---

[253] Doc. no. 47 (Brief in Support of Response to Summary Judgment) at 9, 11 (alterations supplied).

[254] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 352-54, 357-59, 363, 407-08.

(The test is whether "other employees *outside the protected class*, who engaged in similar acts, were not similarly treated.") (emphasis supplied).  Second, plaintiff has neither alleged nor offered evidence that defendant was aware of Burgess and Robinson's behavior.  *See, e.g., Vickers v. Federal Express Corp.*, 132 F. Supp. 2d 1371, 1380 (S.D. Fla. 2000) ("Disparate discipline cannot be shown without *first* showing that the employer was aware of the comparator's misconduct.") (emphasis supplied).

Further, with regard to plaintiff's 2010 discipline for reading a novel at work, plaintiff asserts that Manager of Patient Accounts David Davis witnessed a white "casual" employee whose first name is "Baylee" (and whose last name plaintiff does not know) reading a magazine at work, and that "Baylee" was not reprimanded.[255]  "Baylee" does not qualify as a comparator, because plaintiff does not allege that "Baylee" *also* failed to improve her productivity and failed to service an account while she was on a performance improvement plan.  Plaintiff admits that she has not seen "Baylee's" personnel file, and was not present for the reprimands of other employees.[256]  Plaintiff's belief that "Baylee" was not disciplined is "based on speculation and conjecture" and, thus, "is not reasonable."  *Blackston v. Shook &*

---

[255] *Id.* at 286, 270-73; doc. no. 26-14 (Declaration of David Davis) ¶¶ 14-15.

[256] Doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 227-29, 273.

*Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985). Finally, with regard to defendant's rejection of plaintiff's application for a promotion to the "non-Medicare revenue integrity specialist" position in August of 2009, plaintiff alleges that defendant selected white employee Melissa Baskins to fill the position on the basis of race.[257] However, plaintiff has not alleged a failure to promote claim, and she does not deny: that she submitted her application after the deadline; that she did not see when her application was received by the Human Resources department; and that both she and a white employee, Belynn "Ann" Heathcoat, received letters stating that their applications had been received after the position had been filled.[258] Instead, plaintiff argues that defendant's racism lies in the fact that "[Melissa] Baskins, who is white and who did not timely bid on the job, was given the job instead of [*Tammy*] Simmons, who is black and who [did] timely bid on the job."[259]

> Even when offered to show pretext rather than a *prima facie* case, "me, too" evidence is suspect. To be probative, the other incidents must implicate a common decisionmaker. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008). "More generally, courts are reluctant to consider 'prior bad acts' in this [employment discrimination]

---

[257] Doc. no. 47 (Brief in Support of Response to Motion for Summary Judgment), at 11.

[258] Doc. no. 26-1 (Deposition of Sheryl Leggs Hamilton, Part I), at 195-201, 204, 212-17; doc. no. 26-2 (Deposition of Sheryl Leggs Hamilton, Part II), at 202-08; doc. no. 26-4 (E-Mail Chain), at 104; doc. no. 26-14 (Declaration of David Davis) ¶ 8; doc. no. 26-15 (Declaration of Diane Myrick) ¶ 5.

[259] Doc. no. 47 (Brief in Support of Response to Motion for Summary Judgment), at 11 (alterations and emphasis supplied).

context where those acts do not relate directly to the plaintiffs." *Denney v. City of Albany*, 247 F.3d 1172, 1189 (11th Cir. 2001). When the evidence involves a kind of alleged discrimination different from that alleged by the plaintiff, "the evidence [may be] likely to confuse the issues for the jury and unfairly prejudice the defendants." *Lewis v. Department of Transportation*, 187 Fed. Appx. 961, 961-62 (11th Cir. 2006) (upholding the exclusion of prior instances of discrimination against others, in part because the plaintiff claimed failure to promote, not retaliation or hostile work environment); *accord Chavis v. Clayton County School District*, 147 Fed. Appx. 865, 866-68 (11th Cir. 2005) (upholding the exclusion of other instances of discrimination against others, because the plaintiff claimed retaliation and the other instances involved failure to promote).

*Bell v. Crowne Management, LLC*, 844 F. Supp. 2d 1222, 1236 (S.D. Ala. 2012)

(alterations in original) (emphasis supplied).

## VII.  CONCLUSION AND ORDERS

In sum, none of the events raised in plaintiff's complaint or recounted by the parties in their briefs are sufficient to support plaintiff's claims of discrimination. Therefore, and for the reasons discussed in this opinion, defendant's motion to strike is GRANTED in part and DENIED in part, defendant's motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice. Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 6th day of June, 2013.

_____
United States District Judge